**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JAMES E. BRADLEY, JR.,**
*on behalf of*
**JAMES E. BRADLEY, III,[1]**

      **Plaintiff,**

                                     **Civil Action 2:20-cv-1391**
    **v.**                              **JUDGE SARAH D. MORRISON**
                                      **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**<u>OPINION AND ORDER</u>**

Plaintiff, James E. Bradley, Jr., on behalf of his son, James E. Bradley, III, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits ("DIB"). This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 17), and the administrative record (ECF No. 14). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's non-disability determination.

---

[1] Plaintiff passed away on July 4, 2021. His father, James E. Bradley, Jr., has been substituted pursuant to Federal Rule of Civil Procedure 25(a). (*See* ECF Nos. 18 & 19.)

# I.  BACKGROUND

Plaintiff filed his application for DIB in January 2018, alleging that he has been disabled since December 8, 2017, due to a back injury.  (R. at 167–73, 185.)  Plaintiff's application was denied initially and upon reconsideration.  (R. at 68–77, 80–89.)  On October 3, 2019, a hearing was held before Administrative Law Judge Timothy Keller ("ALJ") at which Plaintiff, who was represented by counsel, appeared and testified.  (R. at 38–67.)  A vocational expert also testified. (R. at 63–67.)  On October 28, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 9–37.)  On January 16, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY

### A.    Plaintiff's Testimony

At the October 3, 2019, hearing, Plaintiff testified to the following facts.  Plaintiff speculated that his problems started because he was hit by a car in 2000.  (R. at 46.)  He continued to work as a "trash man" after that accident.  (*Id.*)  His back pain started in 2010, gradually worsened, and was "[h]orrible [and] frustrating."  (*Id.*)  Plaintiff started with physical therapy and injections but when those did not help, he was referred to a neurosurgeon.  (R. at 46–47.)  At the time, a doctor told Plaintiff that he had a bone spur that was protruding through and pinching some of his nerves.  The bone spur was removed.  (R. at 47.)  Specifically, Plaintiff had three laminectomies, the first two at L4-L5, and the third at L4-L5, S1-2.  (R. at 47, 48.) After the third surgery, he had to go to the emergency room because he developed an infection.  (R. at

2

48.)  He also had a reaction to the Naprosyn that he was prescribed at the time.  (*Id.*)  Because the three surgeries did not help, Plaintiff had a spinal cord stimulator implanted, but it gave him no relief and even made his symptoms worse; therefore, it was removed.  (R. at 47, 48.)

Plaintiff also testified to the following.  Since his surgeries, he had sought pain management treatment.  (R. at 49, 52.)  He was told that no cause could be found for the aching he experienced in his legs that made him feel like they were being "crushed from the inside out." (R. at 49.)  He was told that there were no bone spurs or pinched nerves and that his only options were to "find a doctor to medicate [him] or learn to deal with it."  (*Id.*)  When the ALJ noted that Plaintiff was using a cane at the hearing, Plaintiff explained that he used it because he had pain that went into his foot and that his leg would go out on him or felt like it would.  (R. at 49–50.) Other than medication, the only thing that helped to relieve his pain was to lay flat on his back. (R. at 60.)  He estimated he spent 15–16 hours per day laying on his back.  (*Id.*)  Plaintiff indicated that he had trouble sleeping due to pain.  (*Id.*)

Plaintiff further testified as follows.  His wife had assaulted him, causing him to fall and injure his right shoulder and that possibly caused issues with his right shoulder, for which he has had surgery.  (R. at 50.)  Since surgery, his right shoulder would hurt in the middle of the night if he rolled over on it for too long, but other than that, it did not bother him too much.  (R. at 51.) He used his right arm during the day to do things like pick up a cup to drink but other than that he did not really need to use his right arm.  (*Id.*)  In addition, since his surgery, he no longer had problems dropping, grabbing, or handling things his right arm.  (R. at 61.)  He did, however,

have some mild muscle cramping in the right elbow. (R. at 62.) He also clarified that his issues

had been with his right shoulder and arm but that there was "nothing on the left." (R. at 43.)

Plaintiff also testified that at one point he had been drinking but that he no longer did so

and that he had been sober since November 12, 2018. (R. at 51.)

### III.    RELEVANT MEDICAL EVIDENCE

**A.    Treatment Records, Opinions, and Other Evidence**

1. Genesis Healthcare Providers

Records from Genesis Healthcare providers indicate that Plaintiff complained of groin

pain in early 2017. (R. at 423–24.) But a CT scan of his abdomen on May 30, 2017, and a CT

scan of his abdomen and pelvis on June 21, 2017, revealed no acute findings. (R. at 423.)

On August 1, 2017, Plaintiff complained of right flank pain. (R. at 424.) Plaintiff

reported that he was negative for back pain, myalgias, and neck pain. (R. at 424.) An

examination revealed that he had a normal range of motion. (R. at 425.) A CT scan of his

abdomen and pelvis that day revealed no acute findings with the exception of an appendicolith

which was nonemergent. (R. at 423, 430.) Plaintiff was also diagnosed with a right inguinal

hernia. (R. at 422.)

A musculoskeletal examination by Dr. Barbara on August 2, 2017, found that Plaintiff's

range of motion and gross motor were both normal. (R. at 933.)  An operative repair of his

hernia was planned after a GI workup was completed. (R. at 934.)

On August 3, 2017, Plaintiff sought treatment from the ER where he reported that he was

suicidal from his groin and chronic back pain. (R. at 436.) He reported that he had been seen by

4

Dr. Barbara the previous day and that a surgical hernia repair was planned.  (R. at 452.)

Musculoskeletal examinations revealed a normal range of motion.  (R. at 440, 456.)

On August 4, 2017, Dr. Barbara performed an appendectomy and a laparoscopy to repair Plaintiff's hernia.  (R. at 458.)  Although he was discharged the following day (R. at 460), he complained of nausea and vomiting at a post-operative visit on August 10, 2017 (R. at 926), and he returned to the ER on August 12, 2017, because he was experiencing redness and pain around his incision (R. at 469).  A CT scan of Plaintiff's abdomen and pelvis showed no evidence of intra-abdominal fluid collections.  (R. at 473.)  There was stranding with a small amount of fluid in the right groin, likely related to his recent surgery.  (*Id*.)  There was a moderate amount of stool in the rectosigmoid colon.  (*Id*.)  The CT scan also revealed multilevel degenerative changes of the lumbar spine.  (*Id*.)  At post-operative follow-up visits on August 17 and 24, 2017, Plaintiff's status was satisfactory.  (R. at 914, 920.)

On September 5, 2017, Plaintiff returned to the ER because of abdominal and back pain, vomiting, and nausea.  (R. at 478.)  A musculoskeletal examination revealed normal range of motion but some tenderness to palpitation without deformity or edema.  (R. at 481.)  Because testing revealed no abnormalities, it was hypothesized that his symptoms might be related to muscle spasms.  (R.at 478.)  A CT scan of the abdomen and pelvis on September 6, 2017, revealed unremarkable and normal findings including no suspicious bone lesions.  (R. at 485.)

On October 1, 2017, Plaintiff reported to the ER with suicidal ideation.  (R. at 491.)  He was admitted.  (*Id*.)  The following day, he reported that he had no physical complaints and was negative for any musculoskeletal symptoms.  (R. at 492.)  He also denied any bone pain, joint

pain, joint swelling, muscle aches, or history of fractures.  (R. at 507.)  A musculoskeletal examination revealed normal range of motion with no edema, tenderness, or deformity.  (R. at 493.)  He additionally had full ranges of motions in his extremities.  (R. at 508.)  He did, however, report that he had chronic back pain and that he used alcohol to cope.  (R. at 528–29, 531.)  He was discharged on October 3, 2017.  (R. at 510.)

On October 4, 2017, Plaintiff reported to the ER for chest pain and respiratory problems. (R. at 546.)  He reported that he was negative for back pain and neck pain.  (R. at 549.)  A musculoskeletal examination revealed no edema or tenderness.  (R. at 560.)  After a chest X-ray, he was diagnosed with bronchitis and persistent cough.  (R. at 545–46.)

On October 16, 2017, Plaintiff reported to the ER for abdominal pain.  (R. at 568.)  He reported that he was negative for any musculoskeletal symptoms.  (*Id*.)  A musculoskeletal examination found normal range of motion and he had no deformity in the right shoulder.  (R. at 569.)

On December 6, 2017, Plaintiff sought treatment for alcohol withdrawal.  (R. at 591.)  He reported that he had chronic back pain.  (R. at 595.)  An examination found no cyanosis, clubbing, or edema in his extremities.  (R. at 596.)  A stationary ECG study found a possible right atrial enlargement.  (R. at 597.)  A December 7, 2017, a CT scan of Plaintiff's head revealed no acute intracranial abnormalities.  (R. at 586.)  He was discharged on December 10, 2017.  (R. at 600.)

On December 24, 2017, Plaintiff reported to the ER with an altered mental state.  (R. at 643.)  He reported being dizzy and falling frequently.  (*Id*.)  He also reported being positive for

6

myalgias. (*Id.*) At CT scan of Plaintiff's head revealed no acute intracranial abnormalities. (R. at 648.) A chest X-ray found no acute cardiopulmonary process. (R. at 649.) Plaintiff admitted to drinking and his family reported that he drank because of chronic back pain. (R. at 645.) Plaintiff was diagnosed with acute alcohol intoxication and chronic midline low back pain, with sciatica presence unspecified. (R. at 642.) He was referred to a back pain clinic. (R. at 645.)

On January 5, 2018, Plaintiff reported to the ER with withdrawal symptoms. (R. at 655.) He indicated he had blacked out and fallen in his driveway three weeks prior and that his shoulder had been hurting since. (R. at 656.) He reported being positive for left shoulder pain and muscle pain. (R. at 675.) Musculoskeletal examinations found normal ranges of motion and no deformity in Plaintiff's right shoulder. (R. at 657, 706, 710.) An X-ray of Plaintiff's left shoulder was unremarkable. (R. at 668.) A stationary ECG study found sinus tachycardia and abnormal rhythm. (R. at 676–77.) A chest X-ray found no acute process. (R. at 669.) Plaintiff also complained of chronic headaches and noted that he had such a headache during his last ER visit that had resolved when he was administered Dilaudid and Phenergen and he requested that he be given that medication combination again. (R. at 681.) Plaintiff also frequently requested narcotics during his ER visit. (*Id.*) His urine was positive for benzodiazepines. (R. at 682.) He was diagnosed with alcohol withdrawal and chronic left shoulder pain although the unremarkable shoulder X-ray was noted. (*Id.*) Plaintiff was also diagnosed with spinal stenosis of the lumbar region with radiculopathy. (*Id.*) Although Plaintiff reported that his pain associated with his stenosis was chronic, he reported that it was not bothering him at all. (*Id.*) Plaintiff was discharged on January 8, 2018. (*Id.*)

A March 12, 2018, MRI of Plaintiff's right wrist found no acute osseous abnormalities. (R. at 731.)  There was some heterogenous signal of the scapholunate ligament that could have been due to a strain or partial tear.  (*Id*.)  There was also a 9mm septated lobulated probable ganglion cyst at the anterior radial margin of the distal radius.  (*Id*.)

On September 29, 2018, Plaintiff reported to the ER for a psychiatric evaluation after experiencing suicidal thoughts and his family found him with a loaded gun in his hand.  (R. at 750.)  He reported no other medical complaints but admitted that he had been binge drinking for the past week.  (R. at 750, 764.)  A musculoskeletal examination found normal range of motion and no edema.  (R. at 751.)  His blood alcohol content was "301" [sic].  (R. at 765.)  Plaintiff asked for pain medications and stated that he had been drinking because his lower back was hurting.  (R. at 764.)  A CT scan of Plaintiff's lumbar spine showed postoperative change and multilevel degenerative disease but no acute findings.  (R. at 761.)  Plaintiff was diagnosed with alcoholic intoxication with complications and suicidal ideation and admitted for psychiatric evaluation.  (R. at 765.)  He was released the following day.  (R. at 779.)

Plaintiff sought treatment for chronic radiating back pain from Nathaniel Amor, D.O. at Genesis, on October 15, 2018.  (R. at 950.)  Plaintiff reported that his pain had started 7 or 8 years ago and had persisted despite multiple surgeries and therapies including a spinal cord stimulator.  (*Id*.)  Plaintiff indicated that the pain began in his low back and radiated down his buttocks to the back of his left leg and to the plantar surface of his foot.  (*Id*.)  A musculoskeletal examination found a full range of motion in Plaintiff's lower extremities.  (*Id*.)  Plaintiff also had 5/5 in all muscle groups that were tested, a negative straight leg test, but a positive faber test on

8

the left. (R. at 953–54.) Plaintiff also had normal lumbar lordosis and gait, and his extremities were symmetrical with no gross abnormalities. (R. at 954.) Dr. Amor saw no spinal pathologies on Plaintiff's most recent MRI in 2016, but because of Plaintiff's new right leg symptoms, he ordered an MRI. (R. at 250.)

A November 9, 2018, MRI of Plaintiff's lumbar spine found mild to moderate multilevel degenerative changes of the lumbar spine. (R. at 740.) Findings were most pronounced at L4-5 and L5-S1. (*Id*.) There were also partial laminectomy changes at L5-S1. (*Id*.) A lumbar X-ray that day showed similar findings. (R. at 745.) On November 13, 2018, Plaintiff reported to the pain clinic for lumbar and right back pain and to discuss the results of his recent testing. (R. at 809.) There was no instability shown on his X-rays and no nerve compression on his most recent MRI, and thus, there were no surgical options. (*Id*.) Plaintiff reported that he was positive for neck, back, and leg pain, and he rated his leg pain as a 7–8. (R. at 812.) But a musculoskeletal examination found that he had a full range of motion in his lower extremities. (R. at 813.) Plaintiff was referred to pain management for a possible morphine pump. (R. at 809.)

On November 13, 2018, Plaintiff reported to the ER because his family believed he had overdosed on Ambien and alcohol. (R. at 818.) Plaintiff's blood alcohol level was "134" [sic]. (R. at 832.) Plaintiff reported that he was negative for arthralgias, back pain, myalgias, neck pain, and neck stiffness. (R. at 820.) A musculoskeletal examination found normal range of motion and no edema or tenderness. (R. at 821.) A CT scan of the head showed no acute intracranial abnormality. (R. at 829.) An EKG showed no signs of an acute ischemia or infarct. (R. at 818, 842–43.) He was admitted for evaluation and observation and released the following

9

day.  (R. at 819.)  An examination on the day Plaintiff was released found that Plaintiff's

extremities were normal and atraumatic and he had no cyanosis or edema.  (R. at 837.)

    2.   Amelia Lepi, APRN.CNP.  ("NP Lepi")

Notes from this provider about Plaintiff's physical health indicate that he sought

treatment on June 2, 2017, for right flank pain.  (R. at 300.)  Upon examination he had

tenderness in the right lower quadrant and CVA tenderness.  (*Id.*)  At a follow-up visit on June 9,

2017, Plaintiff reported that his flank pain had worsened.  (R. at 303.)

On January 12, 2018, Plaintiff sought to reestablish primary care.  (R. at 307.)   He

needed a form completed so that he could admit himself into an inpatient facility for alcohol

dependence.  (*Id.*)  Plaintiff also reported that he had a headache every day.  (R. at 311.)  Plaintiff

indicated that he exercised by walking two to three times a week.  (R. at 308.)  A

musculoskeletal examination found a normal range of motion.  (R. at 312.)  Plaintiff was

prescribed baclofen for muscle pain related to his shoulder pain from a recent fall and Trazodone

for sleep disturbances.  (R. at 313.)

At a follow-up visit for his sleep problems on January 25, 2018, Plaintiff reported that the

Trazodone offered no relief.  (R. at 315.)  Plaintiff also complained of low back pain that had

started about nine years prior and gradually worsened.  (*Id.*)  He indicated that he had been

crushed by a car in 2000.  (*Id.*)  He reported "incredible pain" even with injections, pain

management, physical therapy, and a failed spinal stimulator.  (*Id.*)  Upon examination, Plaintiff

had a decreased range of motion and pain in the lumbar back and he exhibited positive straight

leg testing on the left.  (R. at 316.)  He was diagnosed with osteoarthritis of the spine with

radiculopathy in the lumbar region and referred to a pain clinic. (R. at 316–17.) Plaintiff was also diagnosed with sleep disturbance and hypercholesteremia. (R. at 317.)

On February 23, 2018, Plaintiff sought treatment for right thumb pain after falling at home six weeks prior. (R. at 319.) Upon examination he exhibited decreased range of motion and tenderness in the right wrist and snuff box tenderness on the right, but he had no swelling, effusion, deformity, or laceration. (R. at 320.)

On June 14, 2018, Plaintiff reported medication issues. (R. at 324.) Blood work was done and his statin was discontinued. (*Id*.) On July 27, 2018, Plaintiff reported skin issues including bruising, scalp irritation, and periodic itching that he attributed to CT scans with dye. (R. at 326.) A musculoskeletal examination showed normal range of motion. (R. at 327.) More blood work was done and vistaril was prescribed for his itching. (R. at 328.)

On September 13, 2018, Plaintiff sought treatment for pain in his left foot that had started hurting recently. (R. at 330.) He indicated that he was involved in a motor vehicle accident years ago and that both feet were badly injured. (*Id*.) He further indicated that he was taking Percocet for his foot pain. (*Id*.) Plaintiff reported chronic pain to the bottom of both feet. (R. at 331.) Upon examination, there was tenderness in the left foot. (*Id*.) Plaintiff was referred to a podiatrist. (*Id*.)

On October 8, 2018, Plaintiff requested referrals for neurosurgery and psychiatric help. (R. at 333.) He reported that he was positive for lower back pain and dysphoric mood. (R. at 334.) Plaintiff was prescribed Robaxin for his back pain and given the requested referrals. (R. at

11

335.) On December 7, 2018, Plaintiff was prescribed Gabapentin for nerve pain down his legs. (R. at 346.)

At an annual visit on January 10, 2019, Plaintiff reported that he was positive for arthralgias. (R. at 350.) Specifically, right shoulder pain after he was "beat up" by his wife. (*Id.*) A musculoskeletal examination showed normal range of motion. (R. at 351.) He was advised to begin a progressive daily aerobic program. (R. at 352.)

On March 11, 2019, Plaintiff complained that he had been experiencing constant headaches for three months accompanied by dizziness, light sensitivity, and a stiff neck. (R. at 1045.) He reported that he had been hit in the head by his wife in December and suffered a brief loss of consciousness. (*Id.*) Upon examination, he had normal strength. (R. at 1045–46.) A March 19, 2019, CT scan of the Plaintiff's head showed no acute intracranial abnormality, but he did have mucosal disease of the right maxillary sinus. (R. at 1053.)

At a May 10, 2019, appointment, Plaintiff indicated that he had been exercising. (R. at 1018.) He denied any muscle pain associated with his medications. (*Id.*) He reported that he was positive for neck pain and stiffness. (R. at 1020.) His headaches were also improving with medication. (R. at 1021.)

On June 24, 2019, NP Lepi signed a Medical Source Statement authored by physical therapist Marcus Johnson ("PT Johnson"). In that document, PT Johnson indicated that Plaintiff could occasionally lift 1-5 pounds; rarely lift 6-10 pounds; and never 11 or more pounds. (R. at 989.) He also indicated that although Plaintiff could frequently do fingering with both hands, he could only rarely reach or handle with both arms and hands. (R. at 989–990.) In addition, PT

12

Johnson wrote that in an 8-hour workday, Plaintiff could only stand or walk for 2 hours total, for 15 minutes at a time; and only sit for 2.5 hours total, for 20 minutes at a time.  (R. at 990.)  PT Johnson further wrote that Plaintiff could never bend or climb ladders, and could only occasionally crouch/squat, crawl, and climb steps or ladders.  (*Id*.)  PT Johnson also indicated that Plaintiff's condition was likely to deteriorate if placed under stress, particularly stress associated with a job.  (*Id*.)  PT Johnson stated that Plaintiff would be likely to miss 2 or more days per month due to his diagnosed conditions, pain or side effects from medication.  (R. at 991.)  PT Johnson indicated that he had reviewed Plaintiff's medical records and treatment notes and that the limitations in the document were due to Plaintiff's lower back pain, difficulty lifting with his left lower extremity, and that stairs were "very difficult and requires rail and step to gain pattern."  (R. at 991.)

3.  Michael Sayegh, M.D.

Plaintiff was referred to Dr. Sayegh for chronic pain treatment.  (R. at 247.)  At his initial visit on March 15, 2018, Plaintiff complained about pain, numbness, and weakness in his right and left leg, low back pain, and trouble walking.  (*Id*.)  Plaintiff explained that he had tried a back brace, a TENS unit, a stimulator that was placed and removed, steroid injections, and three lumbar laminectomies but he continued to experience chronic pain.  (*Id*.)  Plaintiff rated his pain as an 8 on a 10-point scale.  (*Id*.)  A physical examination found that Plaintiff's low back area showed trigger points and tenderness bilaterally and in the paraspinal muscles.  (*Id*.)  A neurological examination of Plaintiff's lower extremities showed they were intact.  (*Id*.)  Plaintiff also had a mildly positive left seated straight leg raising test but a negative test on the right.  (*Id*.)

13

Push pulls were equal.  (*Id.*)  Dr. Sayegh diagnosed Plaintiff with low back pain; sprain /strain;

sciatica; HNP with tear; post laminectomy syndrome; left shoulder pain; osteoarthritis;

hypertension; spinal cord stimulator placement and removal; anxiety; depression; and sleep

disturbance.  (*Id.*)  Plaintiff was prescribed Percocet.  (R. at 248.)

At an appointment on April 12, 2018, Plaintiff rated his pain as a 6-7 on a 10-point scale.

(R. at 249.)  (*Id.*)  He reported that the medication seems to be helping to improve his symptoms

and lifestyle.  (*Id.*)  Examination results were the same.  (*Id.*)  Plaintiff's Percocet prescription

was renewed.  (*Id.*)

On June 11, 2018, Plaintiff rated his pain as between 3 and 6 on a 10-point scale.  (R. at

254.)  He reported that his pain medication seemed to be helping with his pain and quality of life.

(*Id.*)  Examination results were the same.  (*Id.*)  Plaintiff's Percocet prescription was renewed

again.  (*Id.*)

On June 28, 2018, Dr. Sayegh completed a medical source statement.  (R. at 252–53.)  In

that document, Dr. Sayegh wrote that Plaintiff had been diagnosed with post laminectomy

syndrome and that he suffered from chronic lower back pain.  (R. at 252.)  Dr. Sayegh noted that

Plaintiff had a positive seated straight leg raising test and there was an MRI on file regarding his

condition.  (*Id.*)  Dr. Sayegh opined that Plaintiff would have difficulty with heavy lifting,

greater than 20 pounds, and with prolonged walking and standing.  (R. at 253.)  He also opined

that Plaintiff could not engage in any climbing or operate heavy machinery.  (*Id.*)

On August 6, 2018, Plaintiff rated his pain as a 7 on a 10-point scale.  (R. at 290.)  He

also reported that the medication seemed to be helping to improve his symptoms and lifestyle,

however, he complained of increased pain and numbness in the right leg and constant left leg pain. (*Id.*) Physical examination results were the same except that Plaintiff had a mildly to moderately positive left seated straight leg raising test. (*Id.*) Plaintiff's Percocet prescription was renewed. (*Id.*)

On October 4, 2018, Plaintiff rated his pain as a 7 on a 10-point scale. (R. at 288.) He also reported that the medication seemed to be helping to improve his symptoms and lifestyle. (*Id.*) Examination results were the same as August 6, 2018. (*Id.*) Plaintiff's Percocet prescription was renewed and he was also prescribed lumbar physical therapy. (*Id.*)

On November 29, 2018, Plaintiff reported that his pain was the same as at his last visit but sometimes worse. (R. at 286.) He also reported that his medication seemed to help with his pain and helped him be able to complete his activities of daily living. (*Id.*) Examination results were the same. (*Id.*) Plaintiff continued to be prescribed Percocet. (*Id.*)

On January 28, 2019, Plaintiff rated his pain as 6-7 on a 10-point scale. (R. at 284.) He reported that the medication seems to be helping to improve his symptoms and lifestyle. (*Id.*) Examination results were the same except that a left seated slump test was mild to moderately positive. (*Id.*) Plaintiff's Percocet prescription was renewed. (*Id.*)

4. Orthopaedic Associates

Plaintiff sought treatment from this provider on March 23, 2018, for right thumb and wrist pain that developed after a fall. (R. at 259.) His symptoms increased with range or motion, grasping/gripping, lifting, and most activities requiring use of his right hand. (*Id.*) An examination revealed no swelling, erythema, or ecchymosis. (R. at 260.) He did have marked

15

tenderness with direct palpitation over the IP joint and tenderness at the joint with passive flexion and extension. (*Id*.) But he had good sensation of light touch distally and he denied pain with palpitation over the CMC joint and the wrist joint or over the scaphoid. (*Id*.) X-rays and an MRI showed no acute bony abnormalities. (*Id*.) There was a 9mm ganglion cyst of the distal radius. (*Id*.) Plaintiff received an injection of Kenalog in the right thumb and an injection of lidocaine at the IP joint. (*Id*.)

Plaintiff sought treatment from this provider in January 2019, for right shoulder pain that developed after he reportedly "got the 'living crap' beat out of him." (R. at 264.) The pain was located over the anterior and lateral shoulder, and the discomfort increased with range of motion, overhead activities including lifting, and sleeping. (*Id*.) Upon examination, Plaintiff's right shoulder was symmetric and had no swelling or ecchymosis. (R. at 265.) He had pain with forward flexion to 90° and discomfort with abduction to 45°. (*Id*.) He also had pain with palpitation over the anterior shoulder including the occipital groove and lateral shoulder but no pain over the clavicle or a.c. joint. (*Id*.) Strength testing showed that his right shoulder was significantly weaker when compared to the left. (*Id*.) He also had a positive Neer's impingement sign and negative drop arm test. (*Id*.) Plaintiff had full range of motion, however, in the cervical spine. (*Id*.)

Plaintiff's ribs, right humerus, and right clavicle were X-rayed on January 8, 2019. (R. at 277–79.) The rib X-ray showed a remote, healed fracture of the right eleventh rib but no acute cardiopulmonary disease or displaced right rib fracture. (R. at 277.) The humerus and clavicle X-rays showed no acute bony abnormalities. (R. at 278–79.) A February 4, 2019, MRI of

Plaintiff's right shoulder showed a subacromial impingement with AC arthrosis and inferior pointing distal clavicle osteophyte; mild subacromial subdeltoid bursitis and moderate supraspinatus and infraspinatus tendinosis with a tiny low-grade interstitial insertional tear of the anterior supraspinatus tendons; and a subscapularis interstitial insertional tear approaching 50%. (R. at 274.)  It also showed mild bicep tendonitis and flattening of the biceps tendon against the lesser tuberosity.  (*Id*.)  Plaintiff was diagnosed with impingement syndrome and bursitis of the right shoulder.  (R. at 267.)  He was referred to another doctor at the same practice.  (*Id*.)

Plaintiff sought treatment for his right shoulder pain again on February 18, 2019.  (R. at 268.)  Upon examination of his right shoulder, he had no tenderness to palpitation over the acromioclavicular joint, and no tenderness laterally or over the clavicle.  (R. at 269.)  There was no evidence of atrophy. (*Id*.)  Strength testing showed 4/5 for forward elevation and 5/5 for external and internal elevation.  (R. at 270.)  He had pain with impingement testing but no evidence of shoulder instability.  (*Id*.)  Plaintiff was given a cortisone injection and advised to try physical therapy and that if those measures did not help, he could consider a right shoulder arthroscopy with a subacromial decompression and evaluation of the rotator cuff and biceps. (*Id*.)

**B.      Prior Administrative Findings from State Agency Physicians**

Plaintiff's file was reviewed at the initial level by David Knierim, M.D. on May 21, 2018. (R. at 73–75.)  Dr. Knierim found that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday.  (R. at 73.)  Dr. Knierim also found that Plaintiff could frequently balance,

17

kneel, and crouch; occasionally climb ramps/stairs, stoop, and crawl; and could never climb ladders/ropes/scaffolds. (R. at 74.) Dr. Knierim further found that Plaintiff was limited to frequent overhead reaching on the left and frequent handling on the right. (R. at 74–75.) Last, Dr. Knierim found that Plaintiff needed to avoid hazards, specifically, unprotected heights and heavy machinery. (R. at 75.)

Plaintiff's file was reviewed at the reconsideration level by Venkatachal Sreenivas, M.D. (R. at 85–87.) Dr. Sreenivas made the same findings as Dr. Knierim except that Dr. Sreenivas found that Plaintiff had more postural limitations. (*Id.*) Dr. Sreenivas found that Plaintiff could frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. (*Id.*)

## IV.   ADMINISTRATIVE DECISION

On October 28, 2019, the ALJ issued his decision. (R. at 12–37.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2022. (R. at 14.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

had not engaged in substantially gainful activity since December 8, 2017, the alleged date of

onset.  (*Id.*)  At step two, the ALJ found that Plaintiff had the severe impairments of degenerative

disc and joint disease of the spine; degenerative joint disease of the right shoulder with right

shoulder rotator cuff tear and surgical repair; and degenerative joint disease of the right elbow.

(*Id.*)  At step three, the ALJ further found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 21.)

Before reaching step four of the sequential process, the ALJ set forth Plaintiff's residual

functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) except the claimant could occasionally climb ramps and stairs,
> but would be precluded from climbing ladders, ropes, and scaffolds. He could
> frequently balance, but could occasionally stoop, kneel, crouch, and crawl.  The
> claimant could frequently reach overhead with the right arm.  The claimant should
> avoid exposure to moving machinery and unprotected heights.

(R. at 21.)  In reaching this determination, the ALJ considered and discussed medical evidence,

including medical opinions and prior administrative findings.

At step five, the ALJ relied upon testimony from a vocational expert ("VE") to find that

Plaintiff could perform his past relevant work as a general clerical office worker.  (R. at 31.)  The

ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act from

December 8, 2017, until the date of the ALJ's decision.  (R. at 32.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff contends that the ALJ erred when evaluating medical opinions from treating physician, Dr. Sayegh, and nurse practitioner, Ms. Lepi.  (ECF No. 15).  The Court finds that this contention lacks merit.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1) (2012).  A claimant's RFC assessment must be based on all the relevant evidence in his or her case file.  *Id.*  The governing regulations[3] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.  20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)–(5).  With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program s policies and evidentiary requirements."  §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).  Although there are five factors,

---

[3]  Plaintiff's application was filed after March 27, 2017.  Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed.  *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

supportability and consistency are the most important, and the ALJ must explain how they were considered.  §§ 404.1520c(b)(2); 416.920c(b)(2).  And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so.  *Id*.  If, however, an ALJ "find[s] that two or more medical opinions . . .  about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . . " §§ 404.1520c(b)(3); 416.920c(b)(3).

In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually.  §§ 404.1520c(b)(1); 416.920c(b)(1).  Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate."  *Id.*

## A.      Dr. Sayegh's Opinion

Plaintiff challenges the ALJ's assessment of Dr. Sayegh's opinion.  The ALJ analyzed the Medical Source Statement from Dr. Sayegh and concluded that it was not persuasive.  The ALJ wrote:

> The undersigned has read and considered the June 2018 opinion provided by Dr. Sayegh, M.D. . . . .  Dr. Sayegh opined the claimant would have difficulty with heavy lifting over 20 pounds, difficulty with prolonged walking and standing, and should not climb and should not operate heavy machinery.  The undersigned finds the lifting limits generally consistent with the claimant's testimony as well as the evidence of record supporting a history of right upper extremity rotator cuff tearing, shoulder impingement, and shoulder degeneration, requiring surgical intervention and subsequent therapy rehabilitation.  The lifting limitation is consistent with reports the claimant regained function in the arm, but has not used it for more than general routine activities of daily living.  While Dr. Sayegh did not define

22

prolonged walking and standing, the undersigned finds the record does not support significant limitations in this area. The claimant's reports [sic] that he exercises 2-3 times per week . . . was volunteering with the archery team at his daughter's school . . . and was able to go hunting in 2019 . . . supports [sic] the claimant was capable of greater physical activity. The undersigned finds limits on climbing would be consistent with the claimant's upper extremity symptoms as well as the claimant's reports of ongoing radicular back pain. However, total preclusion of climbing ramps/stairs would not be precluded as the claimant did not indicate he was unable to engage in those routine activities when visiting businesses or attending his routine medical appointments. The undersigned finds the limitation on hazards is consistent with the claimant's history of spinal degeneration and reports of radicular pain, requiring ongoing pain management treatment. Therefore, overall, the undersigned has not adopted the physician's provided opinion verbatim, but finds the opinion somewhat persuasive.

(R. at 28.)

The Court finds no error with the ALJ's assessment of Dr. Sayegh's opinion. Dr. Sayegh, a licensed physician, was an acceptable medical source. 20 C.F.R. § 404.1502(a)(1). Accordingly, the ALJ was required to consider all five regulatory factors and explain how the supportability and consistency factors were considered. As the discussion above demonstrates, the ALJ did just that. The ALJ concluded that Dr. Sayegh's opinions about Plaintiff's lifting limitations and hazard limitations (i.e., operating heavy machinery) were consistent with the record evidence; his opinions about Plaintiff's climbing limitation were consistent with the record evidence with regards to some types of climbing but not others; and his opinion about Plaintiff's walking and standing limitations were not supported by the record evidence. (*Id*.)

Plaintiff does not take issue with the ALJ's assessment of Dr. Sayegh's lifting, hazards, and climbing limitations. Instead, he takes issue with the ALJ's assessment of Dr. Sayegh's "no prolonged walking and standing" limitation. (ECF No. 15, at PageID # 1170.) He specifically

23

alleges that the ALJ erred by determining that the walking and standing limitations were not supported by the record because Plaintiff's activities demonstrated that Plaintiff was capable of greater walking and standing.  (*Id.*, at PageID # 1172–73.)

The Court finds otherwise.  An ALJ is permitted to consider a claimant's activities of daily living when assessing a claimant's RFC.  *Deffinger v. Comm'r of Soc. Sec.*, No. 1:18-cv-250, 2020 WL 5247937, at *6 (S.D. Ohio Sept. 3, 2020) (explaining that "the ALJ should in fact review the impacts that an individual's impairments have on daily living as part of assessing the person's RFC."); *Ellison v. Comm'r of Soc. Sec.*, No. 2:16-CV-11332, 2017 WL 990605, at *6 (E.D. Mich. Feb. 22, 2017), (finding that "[t]he ALJ was permitted to take Plaintiff's activities of daily living into account when determining [the claimant's] RFC") *report and recommendation adopted*, 2017 WL 976917 (E.D. Mich. Mar. 14, 2017).  Indeed, policy directs that an ALJ's "RFC assessment must be based on *all* of the relevant evidence in the case record, such as: . . . [r]eports of daily activities."  S.S.R. 96–8, 1996 WL 374184, at *5 (July 2, 1996) (emphasis in original).  Therefore, the Court finds that it was not improper for the ALJ to consider such activities.

Moreover, substantial evidence supports the ALJ's determination.  The ALJ determined that the record did not support substantial walking and standing limitations because Plaintiff exercised 2-3 times a week.  (R. at 28.)  Substantial evidence supports that determination.  On January 12, 2018, Plaintiff reported that he exercised by walking two to three times a week.  (R. at 308.)  On January 10, 2019, Plaintiff was advised to begin a progressive daily aerobic

program. (R. at 352.) At a May 10, 2019, appointment, Plaintiff indicated that he had been exercising. (R. at 1018.)

The ALJ also determined that the record did not support substantial walking and standing limitations because Plaintiff volunteered with his daughter's archery team. (R. at 28.) Substantial evidence supports that determination— the record reflects that Plaintiff volunteered with his daughter's archery team from October 2018 until January 2019. (R. at 355, 366.)

The ALJ also determined that the record did not support substantial walking and standing limitations because Plaintiff was able to go hunting in 2019. (R. at 28.) Substantial evidence generally supports this determination too. The record reflects that Plaintiff went hunting on January 9, 2019, and that he reported that it was a positive experience even though "it [had] physical consequences for him." (R. at 366.)

To the extent Plaintiff alleges that the ALJ erred because he used these activities to completely discount Dr. Sayegh's opinion, this is not an instance where the ALJ used Plaintiff's activities to determine that Plaintiff had no walking limitations. Rather, the ALJ determined that Dr. Sayegh's opinion that Plaintiff could not engage in "prolonged" walking or standing— an amount of walking that was undefined— was not supported by the record. Indeed, the ALJ included walking and standing limitations in the RFC by limiting Plaintiff to light work, which corresponds to standing and walking up to 6 hours in an 8-hour day. (R. at 21.) Notably, the state agency physicians both found that Plaintiff was capable of standing and walking up to 6 hours in an 8-hour day. (R. at 73, 85–86.) Other record evidence also suggests that Plaintiff was capable of at least some walking including examinations finding that Plaintiff had normal range

of motion (*see, e.g.*, R. at 312, 327, 481, 493, 508, 751, 821), normal range of motion in his

lower extremities in particular (R. at 950, 813), and normal gait (R. at 954.)

In sum, the Court concludes that Plaintiff's challenge lacks merit— the ALJ did not

commit reversible error when discounting Dr. Sayegh's opinion about Plaintiff's walking and

standing limitations.

### B.     NP Lepi's Opinion

Plaintiff also challenges the ALJ's assessment of NP Lepi's opinion. (ECF No. 15, at

PageID #1171-1172.)  The ALJ analyzed the Medical Source Statement that was completed by

PT Johnson and signed by NP Lepi and concluded that it was not persuasive.  The ALJ wrote:

> The undersigned has read and considered the opinion of the claimant's nurse
> practitioner . . .  from June 2019.  First, it should be noted in terms of this opinion,
> while the form is signed and dated by the claimant's nurse practitioner, Ms. Lepi,
> at hearing, the claimant reported the Nurse Practitioner had actually *refused* to fill
> out the form and the form was completed by a provider with Genesis Healthcare.
> The claimant, on the record, admitted he was sent for a capacity evaluation at
> Genesis and noted that is what the functional form was based upon.  When
> reviewing the opinion at Exhibit 17F, above the nurse practitioner's signature, in
> the space after the diagnosis section, a physical therapist is noted to have signed the
> form.  This is not inconsistent with the claimant's report that another individual
> completed the capacity form, suggesting the physical therapist (illegible signature),
> completed the opinion form.  It should be noted the undersigned at hearing provided
> the attorney time to submit the capacity evaluation from Genesis that was
> completed and corresponded with the opinion form at 17F; however, neither the
> claimant nor his attorney submitted additional documentation after the hearing.  It
> should be noted the attorney submitted this opinion form in July 2019, several
> months prior to the claimant's scheduled hearing, without submitting the
> corresponding capacity evaluation.  The undersigned finds the opinion less
> persuasive, as the attorney failed to provide the objective physical examination that
> was conducted and reportedly supported the documented limits.  However, based
> on the objective evidence contained within the record, the undersigned finds the
> limits on lifting/carrying more restrictive than the record supports.  The record
> documents the claimant continues to report pain in the lumbar spine, but does not
> report any radiating pain into the upper extremities.  The undersigned finds that the

claimant testified that his right upper extremity was improving with the surgical intervention and physical therapy.  Further, he testified he had no issues with his left upper extremity.  The undersigned finds the limits on the use of the upper extremities more restrictive than the record supports.  For example, the provider opined the claimant could rarely use the left arm and hand.  However, the claimant admitted that he had no left arm/hand impairments.  Additionally, the record showed no left shoulder impairment objectively on imaging . . . .  The claimant evidenced improvement in his right thumb symptoms as discussed above with the thumb injection.  Further, he reported at hearing that his right upper extremity evidenced improvement after surgery and with physical therapy.  He admitted he was generally using the arm as normal for normal activities of daily living.  Thus, the undersigned finds the claimant is less limited in the use of the upper extremities.  The undersigned finds the limits in sitting, standing, and walking inconsistent with the claimant's reports that he was exercising 2-3 times per day as well as volunteering with archery at his daughter's school and going hunting . . . .  The undersigned finds the postural limits partially consistent with the record.  However, the undersigned finds the claimant would be less limited in bending, as the claimant was able to sit during his hearing and was observed to sit during treatment sessions without deficit.  It should be noted bending is required to engage in sitting.  The undersigned finds limitations relating to deterioration if placed under stress unpersuasive, because the therapist is not notably a mental health physician.  The undersigned finds the opinion relating to the onset date of the claimant's limitations unpersuasive, as the opinion was based upon a one time examination of the claimant in 2019.  The therapist did not have a longitudinal treatment history with the claimant and while the nurse practitioner signed the form, she did not conduct that objective examination of the claimant nor did she report the limitations.  The undersigned finds the opinion the claimant would miss more than 2 days of work per month unpersuasive, as the claimant did not routinely report medicinal side effects from prescribed medications, admitted benefit and an ability to engage in activities of daily living with the use of pain medications, as well as improvement in his quality of life . . . .  Further, the claimant was not engaging in treatment that required a recovery period nor did he require recurrent hospitalizations for extended periods of time related to his back condition or symptoms.  While the form notes medical treatment notes were reviewed in the completion of the statement, the claimant reported the functional report was based upon a functional assessment completed at Genesis and there is no objective evidence that his entire record was reviewed by the therapist who completed the exam.  The undersigned finds the opinion handwritten by the therapist unpersuasive.  While the record supports spinal degeneration and radiculopathy, the claimant's self reported activities, such as his ability to engage in routine activities of daily living and his ability to exercise as well as hunt, and his self-report that he was doing well physically are not

> synonymous with the significant limits noted . . . .  Therefore, overall, the undersigned finds the functional form at Exhibit 17F unpersuasive.

(R. at 28–30.)

The Court finds no error with the ALJ's assessment of the Medical Source Statement filled out by PT Johnson and signed by NP Lepi.  PT Johnson was not an acceptable medical source.  20 C.F.R. § 404.1513(a); 404.1502.  But NP Lepi is an APRN.CNP.  (R. at 1104.) Under the regulations that govern claims filed after March 27, 2017, an APRN is an acceptable source.  20 C.F.R. § 404.1502(a)(7).  NP Lepi signed the document, and thus apparently adopted the statements therein as her medical opinions.  Accordingly, the ALJ was required to consider all five regulatory factors and explain how the supportability and consistency factors were considered.  As the discussion above demonstrates, the ALJ did just that.

Again, the ALJ's supportability and consistency assessment was supported by substantial evidence.  The ALJ found that supportability for the opined limitations was lacking because they were allegedly based on an examination done by PT Johnson, but the record contained no reports from that examination.  (R. at 29.)  Substantial evidence supports that determination.  The record is bereft of any documentation from PT Johnson's examination.

The ALJ also found that supportability was lacking for the lifting, carrying, and handling limitations.  The Medical Source Statement filled out by PT Johnson and signed by NP Lepi indicated that Plaintiff could occasionally lift 1-5 pounds; rarely lift or carry 6 pounds; and never lift more than 11 pounds.  (R. at 989.)  In addition, the Medical Source Statement indicated that Plaintiff could only rarely reach and handle with either his right or left arm or hand.  (R. at 989–990.)  The ALJ noted, however, that Plaintiff testified that his right upper extremity was

improved and that he had no issues with his left arm. (R. at 29.) Substantial evidence supports that determination. At the hearing, Plaintiff testified that since surgery, his right shoulder would hurt if he rolled over on it for too long, but other than that, it did not bother him too much. (R. at 51.) In addition, Plaintiff testified that since his surgery, he no longer had problems dropping, grabbing, or handling things with his right arm. (R. at 61.) He also testified that although he had issues with his right shoulder and arm there was "nothing on the left." (R. at 43.) A January 5, 2018, X-ray of Plaintiff's left shoulder was also unremarkable. (R. at 668.)

The ALJ found that the walking and standing limitations in the Medical Source Statement were inconsistent with the record evidence because Plaintiff regularly engaged in exercise, volunteered at his daughter's archery club, and went hunting. As previously explained, substantial evidence supports that determination. Plaintiff reported exercising (R. at 308, 1018), volunteering (R. at 355), and hunting (R. at 366).

In sum, the Court finds that Plaintiff's challenge lacks merit— the ALJ did not commit reversible error when analyzing the opinions contained in the Medical Source Statement filled out by PT Johnson and signed by NP Lepi.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner's non-disability determination is **AFFIRMED**.  The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**


 /s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**